## ESTATE OF DAVID McDOUGAL, DECEASED (No. 2).

### [No. 2,278; decided February 27, 1884.]

**Appraisers—Choice by Court.**—In the opinion of this court, it would best subserve the interests of estates if in all cases the court actually chose all the appraisers, instead of having the representatives of the estate or their counsel choose some of them.

**Family Allowance—Necessity of Notice.**—Under section 1464, Code of Civil Procedure, no notice of an application for family allowance is necessary; yet, in the opinion of the court, it would be a salutary rule to require, and the court of its own motion requires notice to be given to the attorneys for absent or minor heirs, or for persons in adverse interest, in all practicable cases.

**Executor—Duty to Account for Assets.**—It is the duty of an executrix to make a showing to the court of the disposition of the difference between what the estate is prima facie entitled to, and what it is claimed was the whole amount received by her.

**Executor—Removal for Fraud.**—The evidence reviewed, and the charge of fraud against the executrix held not proved. The obligation of proving any fact lies upon the party who substantially asserts the affirmative of the issue, and a court is not justified in placing upon a person charged with fraud the onus of showing that she is guiltless; on the contrary, it is incumbent upon the person making a charge of fraud to maintain it by a preponderance of proof.

**Executor.—The Unfriendliness of an Executrix Toward a Mother,** who is striving to obtain what she can by legal means for her chil-

dren, will not justify the court in adjudging the executrix incompe-tent.

Minor Heirs.—The Court will Endeavor to Conserve the Interests of Minors, and will at all times aid their attorney in obtaining for them their full rights; and any application in that behalf will be welcomed by the court, which regards with the highest favor, the claims of minor heirs.

Evidence.—It would be Contrary to all Rules of Evidence to Ac-cept Testimony that lacks clearness and certainty, and that is with-out corroboration, as against adverse evidence, positive and par-ticular in its nature, and without successful assailment, and going to the main fact in issue itself.

Fraud—Evidence.—Other Things Being Equal, where oath is op-posed to oath, on a charge of fraud, the charge must fall.

Witness.—A Court is not Warranted in Imputing Want of Veracity to a witness, unless it appears that willful falsehood has been told.

A Witness False in One Part of His Testimony is to be Distrusted, but the court should be satisfied that the witness has testified falsely, and may discriminate between distrust and utter rejection of tes-timony.

Evidence.—Entries Made in an Account-book at the Request of One Person by another, as to the ownership of property, are of no more value than any other verbal admissions which the writer orally tes-tified to, which ought to be received with great caution. An entry in favor and not against the interest of a party dictating it is dis-entitled to consideration on that account. And a party cannot be affected by the declaration or entry of a party in his own favor, made without the cognition or consent of the former. Evidence of such character, even when admitted without objection, cannot be too carefully scrutinized, for it is in all cases the most dangerous species of evidence that can be admitted in a court of justice, and the most liable to abuse.

Application for removal of executrix.

P. J. Van Loben Sels, for petitioner.

A. J. Le Breton, for executrix.

COFFEY, J. In the trial of the issues raised by the petition of the attorney for the minor heirs, the reading of briefs of counsel (seventy-three pages in all), the re-exam-ination of the evidence, and the consideration of the au-thorities, an amount of labor has been imposed upon the judge of this court, in addition to his ordinary tasks, that,

it is to be feared, counsel little appreciate in the intensity of their zeal for their respective interests. The petitioner requests of the court a written opinion and "full findings," to which first request the court endeavors here to make response. Counsel also made an oral request that a "finding" be made as to his personal and professional conduct of the cause committed to his custody by the court. Without conceding the necessity of such a "finding" or opinion, the court cheerfully awards him credit for earnestness, energy and exemplary fidelity in prosecuting this petition, which he undoubtedly prepared in good faith and upon premises that apparently justified him in his attempt to add to the assets of the estate, or to prevent their appropriation or spoliation by the executrix in her own interest or to the prejudice of the minor heirs.

The petitioner, in behalf of the minor heirs, the children of Charles J. McDougal, deceased, demands the removal of the executrix on the grounds, generally, of (1) fraud, (2) incompetency, and (3) waste and mismanagement of the estate.

In support of the charge of fraud, the petitioner alleges that the executrix procured, with intent to reduce the valuation of the assets of the estate, the appointment of incompetent appraisers, who, acting under the direction and influence of executrix undervalued the assets of the estate. Two of these appraisers were nominated by the executrix, or by her counsel, and the third, appointed of the court's own desire, was not called upon to act by the executrix. It turned out on the trial of this matter that the two nominees of the executrix acted in good faith; and the reason the third did not act that he was not found in the city, and was supposed to be temporarily absent therefrom. This charge was not pressed by petitioner; but it suggests to the court the comment that it might be better if in all cases the court actually chose all the appraisers.

The petitioner further charges, among the fraudulent acts of the executrix, that she omitted from the inventory mention of large sums of money belonging to the estate, particularly specifying a portion of the "Japanese Indemnity Fund," amounting to $6,300. The whole amount was $21,-

000, and it is claimed, on behalf of the executrix, that the portion omitted was appropriated in pursuance of a contract for the payment of agents who were employed to obtain the amount from the government.

It is also charged that the executrix obtained, through imposition upon the judge at the time temporarily acting in this department, and without notice to the attorney for the minor heirs, an excessive "family allowance."

The petitioner's gravest charge is: "That since the death of David McDougal, but before any letters testamentary were issued to her, to wit, on the twelfth day of September, A. D. 1882, said executrix, with intent to cheat and defraud said minor children, executed and delivered a conveyance to one of her daughters, to wit, Mrs. Di W. Van Voorhies, of a large and valuable tract of land, belonging to the community property of the said David McDougal, deceased, and that no mention of this transaction is made in said inventory, and that said property does not appear in said inventory among the assets of said estate."

1. The first specification, alleging fraudulent conduct in the appointment and acts of appraisement, is not proved.

2. In reference to the "Japanese Indemnity Fund," the court is of opinion that, while no fraudulent conduct is established, the executrix should make a showing of the disposition of the difference between what the estate is prima facie entitled to, and what it is claimed was the whole amount received. This should have been done without compelling the petitioner to have recourse to this mode of procedure to ascertain the facts. In this respect the executrix is guilty of error of judgment, but under the evidence I cannot find fraud in her conduct. As to the character or classification of this property, I do not deem it necessary in this proceeding to venture an opinion. This is an inquiry as to the fraud alleged to have been practiced by the executrix, and I find no fraud.

3. As to the allowance made by order of July 8, 1883, which the petitioner alleges was obtained by false and fraudulent representations and imposition practiced upon the judge temporarily presiding here, and contrary to the custom, rules and practice of this department, it seems to

have been procured in conformity with the section of the statute, which does not necessitate notice such as is suggested by the petitioner: Code Civ. Proc., sec. 1464. Yet, in the opinion of this judge, it would be a salutary rule to adopt in such cases as the one under consideration, and the present judge of his own motion requires the attorney for absent or minor heirs, or other attorney for persons in adverse interest, to be notified in all practicable cases. But the law does not literally require it; and, however censurable the conduct of counsel may be, fraud is not lightly to be imputed to a client for his counsel's conduct. Under the circumstances of this case, the court can only suggest that the allowance would seem to be in excess of the needs of the widow, considered with reference to the other interests. The order was legally applied for and obtained in the customary mode.

4. As to the charge that the petition for the setting apart of a homestead was for the purpose of fraudulently monopolizing assets of the estate, as the issue involved herein is under consideration in another application, it would be more appropriate to withhold an opinion in this proceeding, except to formally indicate that there is no fraud proved as to that particular matter.

5. The charge of fraudulently conveying a certain tract of land in Oakland to her daughter, Mrs. Van Voorhies, is the last item of the specifications, according to the order in which the court has chosen to consider them. The answer to this accusation was, that the property involved in this issue was purchased by the money of Mrs. Van Voorhies, and placed in her mother's name on account of certain apprehensions of the purchaser proceeding from her unhappy domestic circumstances. It was testified by Mrs. Van Voorhies that the money wherewith she made this purchase was the result of her savings of sums donated to her from time to time by her deceased father, David McDougal. Assaults and counter-assaults upon the credibility of the witnesses have been made by counsel with reference to the evidence adduced concerning this matter, but it is just possible to decide this issue either way without imputing perjury to any witness. If there be sufficient support for the story of Mrs.

Van Voorhies that the property back of Tubbs' Hotel, in Oakland, was purchased with the $200 derived by her as she has stated, the executrix will be relieved of the charge of fraud; but it may be questioned whether the court is justified in placing upon her the onus of showing that she is guiltless. Without reference to this question of burden, I shall attempt an examination of the probability of her story of the purchase.

Mrs. Van Voorhies testifies that she purchased the property "back of Tubbs' Hotel" in 1862, with her own money, $200, savings accumulated from donations of small sums at different times from her father; that the title was put in her mother's name because of the uncertainty and unhappiness of her domestic relations, and to protect her child; she considered it prudent, because of her domestic relations, to put this piece of property in her mother's name, "for that reason only." Here is a fact testified to and a motive assigned for it—the purchase and payment with her own means and the placing of title in her mother's name and the reason for such conduct. Counsel cross-examining the witness upon this point, she reaffirmed the statement as to the uncertainty and unhappiness of her domestic relations and her apprehensions for the protection of herself and child, as the motive for the conduct.

As to the fact of purchase and the manner of her acquisition of the means of purchase, Mrs. Van Voorhies' testimony is corroborated by Mrs. Le Breton, her sister, who testified that her father, David McDougal, told her it belonged to his daughter "Di," Mrs. Van Voorhies, who had bought it with her own savings, and that it was put in the mother's name for prudential motives; upon cross-examination she said: "My father always spoke of the property back of Tubbs' Hotel."

Mr. Le Breton, in his testimony, relates a conversation had with David McDougal, in which he said this property was purchased by his daughter "Di" with her own savings.

Mrs. Caroline M. McDougal testifies that the property "back of Tubbs' Hotel" was purchased by her daughter, "Di" W. Van Voorhies, with her own savings; that neither she (the witness) nor her husband (David McDougal) put

any money at all into that property; that the failure to re-convey it until after his death was a mere oversight; that "he often said that he would make a deed of it, but put it off without doing so." This statement was not varied on cross-examination.

The testimony of Robert Foster Patten is not very defi-nite; but, so far as it has any tendency, it is in support of the claim that Mrs. Van Voorhies was the owner of the property involved in this inquiry; and, so far as Wm. Pat-ten's testimony is concerned, it is too indefinite to be taken into account.

Mrs. Van Voorhies testified further, with regard to the purchase (p. 31, vol. 3, Reporter's Notes), that she paid the purchase price, $200, with her own hands, to one Hezikiah P. Jones, from whom she bought the property, he acting for his sister who owned it.

Mr. Jones was called by petitioner, and the tendency of his testimony is to support the statement of Mrs. Van Voor-hies. (Vol. 4, Reporter's Notes.)

Counsel for the petitioner, claiming that the testimony of Mrs. Caroline McDougal, Mrs. Van Voorhies, Mrs. Le Bre-ton and Mr. Le Breton is a concocted story, for the purpose of carrying out the alleged conspiracy to appropriate the assets of the estate, and is overthrown by the evidence sub-mitted on the part of the petitioner, and by the cross-exam-inations conducted by himself, serving to show how untrust-worthy the story of the purchase told by Mrs. Van Voorhies, asks the court to reject it.

Mrs. Kate Coffee McDougal testifies that Mrs. Caroline McDougal stated to her that she had bought that property for a very small sum; that she had bought it herself; that she made such a statement at various times, but she cannot lo-cate time or place of conversation, and is quite indistinct in her recollection upon this point, and her testimony in this respect is contradicted by the other party, who says she does not remember ever having had any such interview, and does not think there ever was any, and she did not talk busi-ness before her (vol. 3, Reporter's Notes).

Mrs. Kate C. McDougal, being cross-examined, says she did not hear David McDougal speak of it very much, indeed

very seldom, but she heard Mrs. McDougal speak of it very often, for she (Mrs. Caroline McDougal) was very confidential with witness' husband about her affairs and spoke to him very often, and she said in her presence that she (Mrs Caroline McDougal) wanted to keep that property back of Tubbs' Hotel for herself; she wanted to keep that; she considered that a valuable piece of property; originally it was bought for a small sum, and it had increased beyond their expectations, and the other members of the family spoke of it as Mrs. McDougal's property; nothing was said about David McDougal's interest in it; he did not speak of it very much; she thinks he was present at some of these conversations; he did not claim it; he spoke of it as his wife's property. Witness could not recollect any time or place at which those conversations occurred. This testimony is met by Mrs. Caroline McDougal as already alluded to (vol. 3, p. 21, Reporter's Notes). Witness also testified to her intimacy with Mrs. Van Voorhies, which intimacy did not involve any discussion of family relations until 1866, in which year witness intermarried with Charles J. McDougal, the son of the executrix and brother of Mrs. Van Voorhies. Witness testifies that at that time the domestic relations of Mrs. Van Voorhies were pleasant and harmonious so far as she knew; that she had a conversation with Mrs. Van Voorhies in 1877 or 1878, at which the latter referred to some money that Mr. Van Voorhies sent to her from Aurora in 1863, with which she purchased the property in Oakland, "in front of Tubbs' Hotel"; this was after Mrs. Van Voorhies' return from Europe, whither she had gone in 1869, and witness further testified that Mrs. Van Voorhies, after her return from Europe, spoke about her unhappy relations with her husband (vol. 2, Reporter's Notes) ; that such conversations occurred in September, 1875, and in speaking of such relations Mrs. Van Voorhies was relating back to a period of eight or ten years; the impression witness derived from her conversations with Mrs. Van Voorhies was that the relations of the latter were and had been "not very happy."

Mr. Van Voorhies was called, and testified that in 1862 and 1863 his relations with his wife were agreeable, and that he, before and after that year, and he concluded in that year,

contributed to the support of herself and child; he sent her money from Aurora, to which place he went about 1863; and it was admitted that the amount he sent was as much in all as $3,000. Witness, under cross-examination, testified that he supported his family always according to his ability, and that, while he was practicing law and occupying public office, he provided for them. He said that his marital relations, with the exception of some intervals which were, perhaps, chargeable to him, were agreeable up to 1868 or 1869, when they went to Europe, where they spent seven or eight years; while there he sent them various sums of money; he lived at the Cosmopolitan Hotel, in San Francisco, for awhile after marriage, but had no idea at this time whether his wife's bills there were paid by her father or otherwise.

Mrs. Van Voorhies, being recalled for cross-examination by petitioner, said that from 1857 to 1862 her husband contributed little or nothing to her support, that their bills were paid by her father and mother; that in 1862 her mother raised the money to enable witness' husband to go to Aurora; that after he went to Aurora he sent her money on two occasions, but these she did not call "regular remittances"; after he returned from Aurora, a few months subsequently, he led the same dissolute life; he gave witness nothing, and her father and mother supported her all the time, and educated her daughter; in 1869 she went to Europe to remove her daughter from such influences, and at intervals he would send her one or two pounds at times; she denied that cordial relations existed between them while she was in Europe, or that she wrote him very cordial letters; and she did not remember that at stated intervals he sent ranging from five to seven and twenty and fifty pounds to her, and that she acknowledged the receipt of same in letters; and, in explanation of letter introduced, she tried to write letters as kind and encouraging as she could.

Several such letters were introduced by petitioner and they seem to be of an affectionate nature, acknowledging receipts of considerable sums, suggesting straits on account of her daughter's education, and encouraging her husband in certain aspirations, admonishing him as to her apprehen-

sion of a return of his habits, and giving certain advice as
to material considerations, laying stress upon his regarding
money rather than fame, and the necessity of providing for
their declining years. She was in Europe nearly seven years,
and from the time of her departure hence until in the court-
room in the progress of this controversy, she had never seen or
spoken to Mr. Van Voorhies; from 1869 they never resumed
marital relations; while in Europe, and long before, her
father and mother mainly supported her; her husband's con-
tributions "amounted to nothing" (the witness' language);
in San Francisco, while staying with her husband at the
Cosmopolitan Hotel, her mother paid her board and all her
bills; this was in 1868; at the Eureka Hotel, in Oakland, he
would procure her bill, and have it made out to her mother,
and his own bill separately, and her mother would pay the
witness' bill and the husband would pay his own; between
the years 1862 and 1868 he was very intemperate, "scarcely
drew a sober breath during that time"; that was his mode
of life, witness said she might say, as far back as 1854; his
sober intervals were rare; she tried to conceal this, and shield
him all she possibly could, and she reared her daughter to
respect him. This is a summary of her story of domestic
infelicities.

Mr. Van Voorhies, on recall, denied that from 1857 to
1862 his mother paid all his expenses or those of his wife;
but thought his mother in law advanced money to aid him to
go to Aurora, and the money for her and child to go to
Europe; he did not remember that he accompanied them to
Sacramento, nor that he took $100 from her of that money,
but would not deny it if his former wife said so: he would be-
lieve her; his condition was such while his wife was in
Europe that he could not support his wife and child, no
matter how cheaply they were living; but while they were
in Europe property they had bought with money he had
supplied them was mortgaged to raise money to pay their
expenses in Europe; he reiterated that his relations with her
at all times had been agreeable; they continued to be so;
the correspondence between them continued until a month or
two prior to her return from Europe, she returned from

Europe incognito, and witness did not know when she came until he was advised by Col. Coffee that she was in San Francisco. Their relations, notwithstanding their tender correspondence, seem to have terminated here in fact, and in law they were shortly afterward separated in 1877.

A Mr. Wood was introduced to prove remittances from Aurora by Mr. Van Voorhies, and the fact that Mrs. Van Voorhies had large amounts of valuable mining stocks standing in her name, which he believed was hers; but this testimony was contradicted by Mrs. Caroline McDougal and Mrs. Van Voorhies, who swore that the property belonged to Mrs. Caroline McDougal.

Mrs. Kate Coffee McDougal was recalled, and testified that her husband, Charles J. McDougal, kept accounts and managed the property "back of Tubbs' Hotel"; and witness identified a book produced by petitioner as an account-book, and that certain entries were made by him in her presence and at the instance of Mrs. Caroline McDougal before she went to Europe; this book, it is claimed, contained an account of all the property that Mrs. McDougal possessed at that time, and that Mrs. Van Voorhies possessed; also the directions that Mrs. McDougal gave him at the time as to the management of the property and what she wanted done with it, and a full and complete account of everything, of what the lots sold for, and all appertaining to the business (vol. 3, Reporter's Notes, pencil page 6). Witness said the instructions and directions were set down in her presence.

Mrs. Caroline McDougal, being called, said she never saw this account-book before; the items therein were never made in her presence, and the account was never made in her presence; when witness went to Europe she left everything in her son's hands, and she didn't positively know if she said anything about the particular property "back of Tubbs' Hotel," she considered it of so little importance, and her daughter always told her if she wanted money to sell the lot and not be cramped for money; it yielded only road assessments, which witness had to pay as her daughter had no money. Witness repeated the mode of acquisition by her daughter of the money wherewith the property was pur-

chased; David McDougal, witness' husband, gave his daughter $100 at one time to buy a winter cloak, and she put it by, and he frequently gave her small sums, ten or twenty dollars, which she saved, and with the savings bought this property in 1862.

Mr. W. K. Van Alen testified that he knew the history of the property in question, and that they all said that piece of property belonged to Mrs. Van Voorhies. Mr. Van Alen was the agent of the family.

The petitioner claims that the whole story of the purchase for $200, in 1862, by Mrs. Van Voorhies, is falsified by the testimony of Mrs. Kate Coffee McDougal, corroborated by the account-book kept by Charles J. McDougal; by the letters from Mrs. Van Voorhies, while in Europe, to her husband; by the testimony of Mr. Van Voorhies; by the remittances from him to her.

Mrs. Kate Coffee McDougal's testimony, standing by itself, lacks clearness and certainty in its details, and it would be contrary to all rules of evidence to accept it, without corroboration, as against adverse evidence, positive and particular in its nature and without successful assailment, and going to the fact itself of the purchase of the property with the means and in the manner testified by the opposing witnesses. It is claimed by petitioner that the testimony of Mrs. Kate Coffee McDougal is corroborated by the account-book of Charles J. McDougal, and by the statements or memoranda contained therein, written in purple ink on four separate pages, the whole of which I here transcribe:

"Mrs. Caroline McDougal possesses the following property, viz.:

"Three houses and lots, corner of Waverly Place and Sacramento street, unincumbered.

"Block E in the Whitcher Tract, in the Township of Oakland, Alameda County, on which is a mortgage held by the Savings & Loan Society of San Francisco for $4,000. Interest at the rate of 1¼ per cent. per month, payable monthly. The note for the above sum falls due on the 28th November, 1870. W. K. Van Alen attends to this, pays interest, etc.

"Southern half of Block 142, County of Alameda, Town of Clinton, unincumbered. A man named Russel has had the use of this land on payment of the taxes.

"Two lots in the Excelsior Homestead Association in San Francisco, unincumbered," on one page.

On the next page:

"Thirty shares stock Vallejo Savings and Commercial Bank. Fifteen per cent. of the par value has been paid on this stock, amounting to $450.

"Block 20, Town of Brooklyn, Alameda County. This block is in the name of Mrs. Caroline McDougal, but belongs to Mrs. D. W. Van Voorhies. This block is mortgaged for $3,000 to Lovell Hardy, Esq., interest at the rate of 1¼ per cent., payable quarterly. On the 14th November, 1870, the next payment of interest, $112.50, is due.

"One lot in the Excelsior Homestead, standing in the name of Mrs. D. W. Van Voorhies; and two lots numbered 1,025 and 1,030 on Gift Map No. 3, in the name of Mary Caroline Van Voorhies; and four lots numbered 1,069, 1,071, 1,073 and 1,075 on Gift Map No. 3, in the name of Margaret Stockton McDougal. Mrs. McDougal has the care."

On another page:

"Pays taxes on, etc. These lots are known as Harvey Brown's $10 lots."

On another page:

"GENERAL INSTRUCTIONS.

"If possible, the Whitcher Tract, or any part of it, is to be sold to pay off the $4,000 mortgage. $12,000 is the price of the entire tract, a smaller quantity at a proportionate price. The result of any sale of this property to go toward satisfying the mortgage.

"Block 20, in Clinton, is to be sold if possible, and the proceeds used to satisfy the mortgage on it for $3,000, held by L. J. Hardy, Esq. $10,000 is the price of the block."

And on a fifth other page is the following:

"Mrs. D. W. Van Voorhies owns three houses and lots on Silver street, numbered 25, 27 and 29, on which there is a

mortgage for $6,000, held by the Savings and Loan Society on Clay street, Mr. Burr, President; interest at the rate one per cent. per month. The interest is paid by W. K. Van Alen, who attends to the property and collects the rent of houses Nos. 25 and 29. House rent of No. 27 is paid to C. J. McDougal.

"At present the following rents are received from this property:

"House 25 ..............................$35 00
House 27 .............................. 27 50
House 29 .............................. 50 00."

The foregoing is, as nearly as practicable, a literal transcription of that portion of Charles J. McDougal's account-book, said to have been taken down by him at the instance of and in the presence of Mrs. Caroline McDougal, and in presence of Mrs. Kate C. McDougal; and for the purpose of illustrating the comments of the court, I will insert, from the testimony of the last named lady, an extract from the Reporter's Notes, after the introduction and reading of the foregoing:

"Q. (By Petitioner.) This is entered by your husband?

"A. That is my husband's handwriting; his own account.

"By the Court. Did you say that all these entries were made in your presence?

"A. That was the instructions and directions.

"By Mr. Van Loben Sels. Were you present when these instructions were given and taken down?

"A. Yes, sir; I was present when they were taken down.

"The Court. There are no dates to them.

"Witness. There are dates.

"The Court. Not in the articles you have read.

"A. Not in the articles I have read.

"Mr. Van Loben Sels. The book is allowed to go in by the gentleman on the other side.

"Mr. Le Breton. I do not see any date to it, and so it goes in only for what it is worth.

"Q. Now, Mrs. McDougal, can you state about the time when those instructions were given and taken down?

"A. At the time of Mrs. McDougal's departure for Europe.

"Q. What time about was that?

"A. I think it was in 1870, in the fall.

"Q. About that time?

"A. In the fall of 1870."

Now, the account-book coming in without objection, "for what it is worth," the question is, What is it worth in corroboration of Mrs. Kate Coffee McDougal, and in proof of the claim here made as to the actual property? If the introduction of this account-book had been objected to, it is difficult to understand upon what principle or rule of evidence its admission could be sustained. I have examined carefully the code and treatises, with a view of ascertaining accurately how this book should be treated, without arriving at any conclusion favorable to its admission; but it is in, and is to be considered for "what it is worth."

In the argument of counsel for petitioner, great stress was laid upon this memorandum or account-book, as corroborative of Mrs. Kate Coffee McDougal, and contradictory of the adverse witnesses. The book contains certain memoranda claimed to have been set down by dictation of Mrs. Caroline McDougal. Are its contents as to these memoranda to be treated as her declaration as to the property "back of Tubbs' Hotel"? That is the only pretext for its consideration. What does it establish? There is no date to that portion which Mrs. Kate Coffee McDougal testified was taken down at the dictation of Mrs. Caroline McDougal. There is a considerable blank before the first page in purple ink, and a page or two after the fifth page in purple ink, before the next entry, which is in another colored ink. As the court remarked, in that portion of the testimony of Mrs. Kate Coffee McDougal hereinbefore quoted, there are no dates to that portion of the book taken down (as testified) in the presence of Mrs. Kate C. McDougal, and by direction of Mrs. Caroline McDougal; but the former witness says that the matter was written at the time of Mrs. Caroline McDougal's departure for Europe, "in the fall of 1870."

This evidence of Mrs. Kate McDougal is met by the denial of Mrs. Caroline McDougal of any knowledge of the book

or of its contents, or of any interview with her son such as was stated, at which the entries were taken down.

Now, assuming the fact to be as stated, irrespective of the flat denial by the party charged with making the admissions contained in those entries or memoranda, what do the entries impart?

The purple ink memoranda begin: "Mrs. Caroline McDougal possesses the following property, viz.": then follows enumeration including the property in question. It is a fact that Mrs. Caroline McDougal did "possess" that property, in so far as holding it in her name, so that that statement cannot operate as a negation of the ownership by Mrs. Van Voorhies; but on the page following the "general instructions" is the statement: "Mrs. D. W. Van Voorhies owns three houses and lots," etc. Here the writer seemed, by his manner of entering the memoranda, to make a distinction between the "possession" of property and the "ownership." Is there any argument deducible from the omission in this last referred to page, of the property back of Tubbs' Hotel? Certainly no implication injurious to the right of Mrs. Van Voorhies can arise therefrom, because there is no doubt she had nothing to do with the making of the memoranda; at that time she was in Europe. But it is true Mrs. Caroline McDougal possessed that property, and did so in the manner always, from the time of its alleged purchase, as testified to, until the conveyance to Mrs. D. W. Van Voorhies; but so far as these memoranda are concerned, it is worth while to consider critically how far they impute to her "ownership." If these memoranda were all made at one time—the memoranda embraced in these five pages—there must have been some distinction running through the mind of the writer as to "possession" and "ownership." But the utmost importance that can attach to these entries is their significance as admissions by Mrs. Caroline McDougal. They are not the declarations of the deceased, Charles J. McDougal, for they come under no rule entitling them to be so considered. If they have any value, they are the admissions of Mrs. Caroline McDougal, and are to be considered as of no greater worth than if the writer were living and orally testifying to

them. They are of no more account than any other verbal admissions, which, as the treatises on evidence repeatedly remark, ought to be received with great caution, as it is subject to much imperfection and mistake, the party himself either being misinformed or not having clearly expressed his own meaning or the witness having misunderstood.

Another point in which this testimony may be considered and criticised: At the time of the admission or entry, it was in favor of and not against the interest of the party who, it is claimed, dictated it, and such declaration might be assailed as disentitled to consideration on that account.

The statute, also, in treating of the effect of evidence, declares that the evidence of the oral admissions of a party must be received with caution: Code Civ. Proc., sec. 2061. But how could the admission of Mrs. Caroline McDougal in her own favor charge the property of Mrs. Van Voorhies? Or how is the latter to be affected by entries made without her cognition or consent? This character of evidence cannot be too carefully scrutinized or too closely criticised. In all cases it is the most dangerous species of evidence that can be admitted in a court of justice, and the most liable to abuse. In most cases it is impossible, however honest the witness may be, for him to give the exact words in which the declaration or admission was made. Much more might be said to the same purport, but it is not necessary to repeat statements of principles well understood by counsel, or to transcribe from text-books or books of decisions.

So far as the contents of this memorandum or account-book of Charles J. McDougal are concerned, it could not occupy any place in this controversy without the illustrative testimony of Mrs. Kate Coffee McDougal. That testimony tends to connect with the entries Mrs. Caroline McDougal, but she denies the whole statement. Oath opposed to oath, so far as that interview is concerned, if all other things are equal, the charge must fall. As to the import and importance of its contents, enough has been said.

The title stood in the name of Mrs. Caroline McDougal, it was "possessed" by her, and at the time indicated in the testimony it was not esteemed of great value, and the right

to dispose of it, in case of emergency, was given by Mrs. Van Voorhies to Mrs. Caroline McDougal. It is not remarkable, therefore, that it was treated as if it belonged to the latter. But it is noteworthy that nowhere in the testimony is there any claim or assertion that David McDougal ever laid any claim to its ownership. Repeatedly, and under various conditions, has it been reported that he spoke of it as his daughter's property, sometimes, it is said, although this testimony is very vague, as his wife's, but never as his own. The petitioner says the recital of a consideration raises a presumption in favor of its being community property; the law says that the recital of a consideration is not conclusive as to the fact, and the testimony here is to the effect that Mrs. Caroline McDougal never paid anything to the grantor, and whosoever paid it, it might be construed as given to her, so that at all events there is something to show it never was community property—no testimony is in to that purport—so that argument as to that is vain; it is founded at most on a presumption overthrown by evidence, unless the court greatly errs in its view of the testimony.

With regard to the letters produced from Mrs. Van Voorhies to her husband, and their effect upon the main item of her testimony, with respect to the purchase of the property, while they show she received some sums of money from him from time to time and breathe a spirit of affection, there is throughout an intimation of straitened circumstances and dependence on some other source. One letter, underlined by petitioner in pencil, says: ''I enclose you the last bill I have received for Carrie's schooling, without her music, which I wish you would attend to at once. Charlie sent the £7 in his last letter which you intended to go towards her other bill; but as it is not nearly the sum, I wish you would lose no time in sending the amount of this one.''

The sentences subsequent to this are not underlined: ''I find I am very much cramped for money, but Carrie must have her school bills paid. I can do without a great deal that others have, but Carrie must be educated. It is a sacred duty of a parent to a child, and you are fortunate in only having one, and one, too, who has never cost you very much.''

This is a letter from Florence, November 29th, no year indicated. There are many other sentences in the letters in a similar strain; also intimations as to his infirmity of intemperance, and admonitions which, in this opinion, have been already alluded to, and showing without doubt that her condition of mind was not very happy; that she was in financial straits; that she had other source of subsistence than his contributions afforded. Were their relations cordial, contrary to her evidence? Do these letters show that, or are they a thin veneering put on, as she said, to "keep up appearances," and to do what she could to maintain an attitude of amity on account of her child? Is it not a pregnant fact, supporting her statement on the stand, that from the time she went to Europe until in this very courtroom in this controversy, she never saw her husband, and marital relations were never resumed, and, although writing tender missives until within a month of her return to this city, she came incognito, and neither sought the other out?

Is it not, also, to be weighed that he himself testified that he could not, by reason of his condition, support her while in Europe; that such money as he sent came from another source; that he was furnished with funds to go to Aurora by her mother, the executrix here; that the money he sent from Aurora went to purchase the property in front of Tubbs' Hotel; that her mother gave her funds to go with her and his child to Europe; that he took $100 of that money from her; that during a long period, from 1857 to the time of the dissolution of the community, his habits were such as to destroy his ability to support her, and that it is in proof that was largely, at least, if not mainly or wholly, dependent upon her parents? I am requested to disregard the testimony of Mrs. Van Voorhies as to the purchase of the property, because of her contradictions in the respect of the letters and her relations with her husband, and remittances from her husband, and certain other remittances; but the testimony must be regarded as a whole, and the court is not warranted in imputing inveracity to a witness, unless it appears that willful falsehood has been told. "A witness false in one part of his testimony is to be dis-

trusted''; but the court should be satisfied that the witness has testified falsely, and then the evidence must be distrusted. To distrust and reject utterly may be discriminated; but it is unnecessary to discuss the meaning of terms, if the substance of her statement be corroborated. There is no inherent improbability in the story of the purchase; the price was not inadequate; the motive was not ·incredible; the means of acquiring the money to purchase were such as might well be believed; the deposit of title in her mother in itself, as a prudential measure, was not an extraordinary act. She swears she bought it in the manner, and with the money acquired as already told; her mother tells a like tale; her sister confirms her story as to the reputation of ownership in the family, and what her father told her (vol. 2, Reporter's Notes, p. 4); Mr. Le Breton testifies in the same strain; but the petitioner says all the testimony must be rejected; because they are concerned with the executrix. The court cannot perceive how Mr. Le Breton and his wife can be interested in the appropriation of these assets, and the court must apply legal rules in testing such questions; but there are circumstances of corroboration in the testimony of Mr. Van Alen, already referred to, and in the testimony of one of the Pattens, called by petitioner, and in the testimony of Hezekiah P. Jones, called by petitioner, from whom Mrs. Van Voorhies claimed to have made the purchase; and, in the same connection, it ought to be noted that there was no attempt apparent, upon the part of respondent, to shut out testimony; and much has come in that might have been questioned with respect to relevancy and competency. A disposition to meet and not to evade the issue was so far manifested.

It was incumbent upon petitioner to maintain his charge by a preponderance of proof. The obligation of proving any fact lies upon the party who substantially asserts the affirmative of the issue. This is a familiar and cardinal rule of evidence. Has the petitioner complied with this legal obligation? His own opinion of his success may be quoted from his first brief (page 31), and it is here inserted: ''We repeat what we stated in our argument: If the fraud and incompetency proven in this case are not sufficient to convince

the court of the unfitness of the executrix for her trust, let these provisions, under which we proceed, be stricken from the statute book, and let it be known to litigants that such is the case. It will thenceforth be safe for any number of heirs, actuated by selfish motives, to conspire and spirit away property belonging to an estate, and although it may then be proven. from old residents, from old family records and memoranda, accounts from old agents, that the property for over twenty years belonged to the estate, that as such all acts of ownership were performed by the deceased, and although the veracity of the conspiring heirs has been attacked by contradicting their testimony in almost every point, in a most convincing manner, let it be known that it will be sufficient for those heirs to deny, and to concoct a theory of their own, uncorroborated by any testimony or any document to insure for them immunity for their covin, and the court will pronounce them proper persons to hold positions of honor and trust.''

Most assuredly, if the counsel's assumptions of the facts established here were well based, this court would make no such announcements; and whatever announcement the court makes, it must respond to the touchstone of evidence and the rules by which evidence is tested. But, in the opinion of the court, the counsel errs in assuming so much as proved ''from old residents''; it is not proved by the Pattens, nor by Van Alen, for their testimony tends in a contrary direction; ''old family records'' I do not understand to be in evidence, the evidential character of the account-book of Charles J. McDougal has been already discussed by the court; ''accounts from old agents that the property for over twenty years belonged to the estate, that as such all acts of ownership were performed by the deceased''; this is an erroneous assumption of counsel; for the twenty years alluded to the deceased never claimed or acted as owner, nor was the property at any time in his name; there is no evidence here that he asserted title in himself, the most that can be claimed is that he said it was Mrs. McDougal's; but I have already dwelt upon this point, also upon the quantity and quality of the evidence for the respondent, which, in my view of the law of evidence, I am compelled to consider preponderant

as to the point of the purchase of the property. Of course, if I am warranted in finding the story of the purchase, told by Mrs. Van Voorhies, sustained by the whole evidence, the charge of covinous conduct against this executrix must fall. This disposes of the last charge specified.

I do not think the charge generally of incompetency and mismanagement is supported by proofs. The executrix may have been in some instances misadvised by counsel, as to the making up of the inventory, for example, and the application for allowance as to the amount, and there may be in our mind an unfriendly feeling toward the mother of the minors, who is striving to obtain what she can by legal means for her children; but the court cannot for those reasons of sentiment adjudge the executrix incompetent. The court will endeavor to conserve the interests of the minors. and will, at all times, aid their attorney in obtaining for them their full rights; and it is proper here to say that any application in that behalf will be welcomed by this court, which regards with the highest favor, as such courts should always regard, the claims of minor heirs. Impressed with the conviction that the petitioner began and has prosecuted this proceeding in good faith and upon grounds apparently justifying it; and recognizing the force of his argument that the adverse counsel should have shown greater consideration, courtesy and candor toward the mother of the minors, who is entitled to be treated with respect, and has an incontestable legal right to urge the claims of her children; and, also, believing that if the counsel for the executrix had advised her that the petitioner was at least morally entitled to be enlightened as to all the facts compulsorily developed in this investigation, and that, therefore, a certain responsibility for this proceeding rests upon the respondent, the costs are imposed upon her, and with this understanding the petition must be denied. Let findings be prepared to correspond with the conclusions herein announced.